# 15-1672

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

───────────────

UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs-Appellees*,

v.

AMERICAN EXPRESS COMPANY, *et al.*,

*Defendants-Appellants*.

(Full caption commences on inside cover)

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## REPLY BRIEF OF DEFENDANTS-APPELLANTS
## AMERICAN EXPRESS COMPANY AND
## AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.
## (FINAL FORM)

| | |
|---|---|
| Evan R. Chesler | Donald L. Flexner |
| Peter T. Barbur | Philip C. Korologos |
| Kevin J. Orsini | Eric J. Brenner |
| CRAVATH, SWAINE & MOORE LLP | BOIES, SCHILLER & FLEXNER LLP |
| Worldwide Plaza | 575 Lexington Avenue |
| 825 Eighth Avenue | Seventh Floor |
| New York, NY 10019 | New York, NY 10022 |
| (212) 474-1000 | (212) 446-2300 |

UNITED STATES OF AMERICA, STATE OF MARYLAND, STATE OF MISSOURI, STATE OF VERMONT, STATE OF UTAH, STATE OF ARIZONA, STATE OF NEW HAMPSHIRE, STATE OF CONNECTICUT, STATE OF IOWA, STATE OF MICHIGAN, STATE OF OHIO, STATE OF TEXAS, STATE OF ILLINOIS, STATE OF TENNESSEE, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF IDAHO, STATE OF RHODE ISLAND,

*Plaintiffs-Appellees*,

STATE OF HAWAII,

*Plaintiff*,

v.

AMERICAN EXPRESS COMPANY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,

*Defendants-Appellants*,

MASTERCARD INTERNATIONAL INCORPORATED, VISA INC.,

*Defendants*,

CVS HEALTH, INC., MEIJER, INC., PUBLIX SUPER MARKETS, INC., RALEY'S, SUPERVALU, INC., AHOLD U.S.A., INC., ALBERTSONS LLC, THE GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., H.E. BUTT GROCERY CO., HYVEE, INC., THE KROGER CO., SAFEWAY INC., WALGREEN CO., RITE-AID CORP., BI-LO LLC, HOME DEPOT USA, INC., 7-ELEVEN, INC., ACADEMY, LTD., DBA ACADEMY SPORTS + OUTDOORS, ALIMENTATION COUCHE-TARD INC., AMAZON.COM, INC., AMERICAN EAGLE OUTFITTERS, INC., ASHLEY FURNITURE INDUSTRIES INC., BARNES & NOBLE, INC., BARNES & NOBLE COLLEGE BOOKSELLERS, LLC, BEALL'S, INC., BEST BUY CO., INC., BOSCOVS, INC., BROOKSHIRE GROCERY COMPANY, BUC-EE'S LTD, THE BUCKLE, INC., THE CHILDRENS PLACE RETAIL STORES, INC., COBORNS INCORPORATED, CRACKER BARREL OLD COUNTRY STORE, INC., D'AGOSTINO SUPERMARKETS, INC., DAVIDS BRIDAL, INC., DBD, INC., DAVIDS BRIDAL CANADA INC., DILLARD'S, INC., DRURY HOTELS COMPANY, LLC, EXPRESS LLC, FLEET AND FARM OF GREEN BAY, FLEET WHOLESALE SUPPLY CO. INC., FOOT LOCKER, INC., THE GAP, INC., HMSHOST CORPORATION, IKEA NORTH AMERICA SERVICES, LLC, KWIK TRIP, INC., LOWE'S COMPANIES, INC., MARATHON PETROLEUM

COMPANY LP, MARTIN'S SUPER MARKETS, INC., MICHAELS STORES, INC., MILLS E-COMMERCE ENTERPRISES, INC., MILLS FLEET FARM, INC., MILLS MOTOR, INC., MILLS AUTO ENTERPRISES, INC., WILLMAR MOTORS, LLC, MILLS AUTO ENTERPRISES, INC., MILLS AUTO CENTER, INC., BRAINERD LIVELY AUTO, LLC, FLEET AND FARM OF MENOMONIE, INC., FLEET AND FARM OF MANITOWOC, INC., FLEET AND FARM OF PLYMOUTH, INC., FLEET AND FARM SUPPLY CO. OF WEST BEND, INC., FLEET AND FARM OF WAUPACA, INC., FLEET WHOLESALE SUPPLY OF FERGUS FALLS, INC., FLEET AND FARM OF ALEXANDRIA, INC., NATIONAL ASSOCIATION OF CONVENIENCE STORES, NATIONAL GROCERS ASSOCIATION, NATIONAL RESTAURANT ASSOCIATION, OFFICIAL PAYMENTS CORPORATION, PACIFIC SUNWEAR OF CALIFORNIA, INC., P.C. RICHARD & SON, INC., PANDA RESTAURANT GROUP, INC., PETSMART, INC., RACETRAC PETROLEUM, INC., RECREATIONAL EQUIPMENT, INC., REPUBLIC SERVICES, INC., RETAIL INDUSTRY LEADERS ASSOCIATION, SEARS HOLDINGS CORPORATION, SPEEDWAY LLC, STEIN MART, INC., SWAROVSKI U.S. HOLDING LIMITED, WAL-MART STORES INC., WHOLE FOODS MARKET GROUP, INC., WHOLE FOODS MARKET CALIFORNIA, INC., MRS. GOOCH'S NATURAL FOOD MARKETS, INC., WHOLE FOOD COMPANY, WHOLE FOODS MARKET PACIFIC NORTHWEST, INC., WFM-WO, INC., WFM NORTHERN NEVADA, INC., WFM HAWAII, INC., WFM SOUTHERN NEVADA, INC., WHOLE FOODS MARKET, ROCKY MOUNTAIN/SOUTHWEST, L.P., THE WILLIAM CARTER COMPANY, YUM! BRANDS, INC., SOUTHWEST AIRLINES CO.

*Movants*.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ............................................................ 1

ARGUMENT ......................................................................................... 6

I.     THE DISTRICT COURT ERRED IN FAILING TO EVALUATE THE EFFECTS OF THE NDPS ON OVERALL COMPETITION ....................... 6

     A.    The Government Cannot Evade Its Burden To Establish Anticompetitive Effects .......................................................... 6

     B.    The District Court Should Have Required the Government To Prove Harm to Overall Competition, Not Just That Merchant Discount Rates Are "High" .................................................. 11

     C.    The Government's Pricing Evidence Was Insufficient To Satisfy Its Burden of Proving Anticompetitive Effects ................................. 19

     D.    The Other Evidence Cited by the Government Fails To Establish Anticompetitive Effects ........................................................ 27

II.    THE DISTRICT COURT ERRED BY DEFINING THE ONLY RELEVANT MARKET AS "NETWORK SERVICES". ........................... 29

III.   THE DISTRICT COURT ERRED IN FINDING MARKET POWER. ....... 33

IV.   THE DISTRICT COURT'S LIABILITY ANALYSIS AND INJUNCTION ARE INCONSISTENT WITH COLGATE. ...................... 39

CONCLUSION ...................................................................................... 43

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Bailey v. Allgas, Inc., 284 F.3d 1237 (11th Cir. 2002) ...........................................25

Balaklaw v. Lovell, 14 F.3d 793 (2d Cir. 1994).......................................................31

Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (1979) ...........................31

Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406
    (7th Cir. 1995)....................................................................................................23

Brantley v. NBC Universal, Inc., 675 F.3d 1192 (9th Cir. 2012) .............................7

Broadcast Music Inc. v. CBS Inc., 441 U.S. 1 (1979).....................................6, 7, 12

Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209
    (1993).................................................................................................................22

Brown Shoe Co. v. United States, 370 U.S. 294 (1962).........................................31

Cal. Dental Ass'n v. FTC, 526 U.S. 756 (1999).......................................................8

Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,
    996 F.2d 537 (2d Cir. 1993) .......................................................................passim

CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74 (2d Cir. 1999)....................10

Eastman Kodak Co. v. Image Technical Services, 504 U.S. 451 (1992)....31, 35, 36

Eiberger v. Sony Corp. of America, 622 F.2d 1068 (2d Cir. 1980) .......................39

Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986) ...................................8, 9

FTC v. Indiana Federation of Dentists, 476 U.S. 447 (1986)..................................8

Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.,
    386 F.3d 485 (2d Cir. 2004) ...............................................................20, 21, 22

K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123
    (2d Cir. 1995)...................................................................................................passim

L.A. Land Co. v. Brunswick Corp., 6 F.3d 1422 (9th Cir. 1993)...........................37

Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877
    (2007)...................................................................................................17

Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984) ...............................39

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978) ........................9

NCAA v. Bd. of Regents of the Univ. of Oklahoma, 468 U.S. 85 (1984)...............8

Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of
    Rhode Island, 883 F.2d 1101 (1st Cir. 1989) ....................................................10

PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002) ..........................20, 21

PSKS, Inc. v. Leegin Creative Leather Prods, Inc., 615 F.3d 412
    (5th Cir. (2010) .................................................................................33

Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37
    (7th Cir. 1992)..................................................................................22

Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953) ...........16, 31

Todd v. Exxon Corp., 275 F.3d 191 (2d Cir. 2001) ...........................................7, 16

Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90 (2d Cir. 1998)..................7, 17

Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000) ..................................39, 41

U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986 (11th Cir. 1993) .............36

United States v. Colgate & Co., 250 U.S. 300 (1919)......................................passim

United States v. Eastman Kodak Co., 63 F.3d 95 (2d Cir. 1995).....................36, 37

United States v. Grinnell Corp., 384 U.S. 563 (1966)...........................................31

United States v. Visa U.S.A. Inc., 344 F.3d 229 (2d Cir. 2003) ................15, 25, 26

United States v. Visa U.S.A. Inc., 163 F. Supp. 2d 322 (S.D.N.Y. 2001) ..............15

Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256
   (2d Cir. 2001)................................................................................24, 25

Xerox Corp. v. Media Scis., Inc., 660 F. Supp. 2d 535 (S.D.N.Y. 2009) ...............23

## PRELIMINARY STATEMENT

The Government's brief presents this Court with a stark choice. We contend that the antitrust laws are implicated by a vertical restraint only if competition and consumers as a whole are harmed by higher prices, lower output or decreased quality. The Government, however, focuses solely on the ability of merchants through steering to obtain a lower merchant discount rate for accepting credit cards. The Government thus ignores, and ignored below, both the full scope of interbrand competition—that is, the competition among the four general purpose credit and charge ("GPCC") card networks (Visa, MasterCard, Amex and Discover)—and the welfare of cardholders.

However, the four GPCC networks do not compete solely with respect to the fees charged to merchants. Merchants would use no network services and would pay no fees unless cardholders choose to use a GPCC card. Each transaction on one of the GPCC networks requires both a willing merchant <u>and</u> a willing cardholder, which means that the GPCC networks must "account for the interdependence between the demands of each side of the platform and strike a profit-maximizing balance between the two". SPA13. That is why it is undisputed that transaction volume is the relevant metric in assessing share and output. Government.Br.5; SPA68. It is also why, in the words of the District Court, GPCC networks are "unlike many two-sided platforms" and why economists call the

market in which they compete a "transaction market". SPA11-12. Given these facts, the Government's burden was to prove that the NDPs impair competition among the networks for transaction volume, taking into account the ways in which the networks compete for <u>both</u> merchant acceptance and cardholder use. The Government's efforts to defend the District Court's failure to apply the correct legal standard are unavailing.

<u>First</u>, while the District Court's decision turns on its finding that merchant discount rates would be lower absent the NDPs, the Government concedes that the merchant discount rate is only half of the total price for a unit of network services. The other half—called a "negative price" by the Government's expert, SPA91 n.36— is the rewards and other benefits provided to cardholders. Whether purportedly higher discount rates are a product of impaired competition among networks or simply a result of enhanced competition that results in lower prices (that is, more rewards) on the cardholder side of the market, and whether the joint consumers of network services (merchants and cardholders) are on the whole better or worse off as a result of the NDPs, are critical questions that neither the Government nor the District Court answered. The Government cannot escape its burden by reciting general principles from cases involving <u>per se</u> liability and importing the abbreviated "quick look" standard from cases involving horizontal conspiracies.

2

The Government also cannot escape the law in this Circuit (and others) requiring margin and cost data before a "high" price can be deemed supracompetitive. Here, the District Court rejected as "unreliable" all cost and margin data in the record. As a result, even if the focus of the case were appropriately confined to the impact of the NDPs on the merchant discount rate, the Government did not meet its burden of introducing cognizable evidence to support the District Court's findings that those rates were supracompetitive. (Infra Part I.)

Second, the Government fails to justify the District Court's decision to ignore commercial realities and divide the indivisible joint consumers of a single product into separate markets so as to avoid "frustrating" its analysis. The Government suggests that the service of enabling a cardholder to use a credit card cannot be in the same market as the service of enabling a merchant to accept that credit card because one is not interchangeable with the other. But that is like saying left shoes and right shoes must be in different markets because they are not interchangeable. That is neither the law nor sensible economics. (Infra Part II.)

Third, stripped of its claim that Amex's prices are supracompetitive, the Government's market-power case rests entirely on the so-called "insistence" of Amex cardholders. The Government is wrong as a matter of law that such loyalty—acquired through vigorous and ongoing competition—is sufficiently durable to establish cognizable market power. This is not a situation where Amex

3

controls all the printing presses or oil refineries in town, and therefore owns access to a vital resource or means of production. Amex does not "own" any cardholder. Virtually every Amex cardholder already has a Visa or MasterCard, and today's "insistent" Amex user may be tomorrow's loyal Visa user because of the intense competition between the GPCC networks that plays out every day in television ads, billboards and mailboxes across the country. (Infra Part III.)

Fourth, the Government fails to provide a reason for this Court to countenance the District Court's fundamental misapplication of United States v. Colgate & Co., 250 U.S. 300 (1919), which recognizes that a firm like Amex is free to choose not to do business with "whomever" it likes. Unable to defend the District Court's mistake, the Government claims that it is harmless error. That is false. By incorrectly assuming that Amex could not have utilized its right of unilateral termination to curb at least some merchant steering in the "but for" world, the District Court erroneously overstated the impact of the NDPs in curbing steering. It also understated the legal significance of enjoining Amex's unilateral conduct going forward (because it erroneously assumed Amex never could have engaged in that conduct in the first place). (Infra Part IV.)

In sum, the District Court declared the NDPs unreasonable restraints of trade only by identifying and then ignoring much of the competition that actually takes place in the GPCC industry. The court recognized Amex's need to balance the

4

interdependent (and often conflicting) interests of the two sides of each transaction in competing against its ubiquitous rivals. SPA13. It also recognized that the point of sale—at which the steering would occur—is the "critical 'moment of truth'". SPA24. And it recognized that credit card transactions require both cardholders and merchants. SPA11-12. But the District Court skirted these competitive realities by relieving the Government of its most fundamental burden under the rule of reason: to prove that Amex's prices are supracompetitive or that quality or output of credit card transactions have been reduced. The result is an injunction that promises to upend a dynamic marketplace by forbidding the leading innovator from defending the brand it has built on differentiated product offerings.

Many firms, including Amex, can only compete with their larger rivals by investing continuously to offer a superior product to win the loyalty of their customers. To affirm the judgment below would set a dangerous precedent for those firms that such investments could confer market power at a share of only 26 percent (and perhaps even lower), and that actions taken to defend those investments and the very value of a company's brand will be deemed unlawful if they have any effect on price. Such a dramatic expansion of antitrust principles would stifle the very competitive conduct the antitrust laws are meant to foster. The judgment below should be reversed.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN FAILING TO EVALUATE THE EFFECTS OF THE NDPS ON OVERALL COMPETITION.

The Government's position rests on a series of incorrect arguments, all designed to reduce its burden to the point of nonexistence and obscure the way in which competition really occurs in this marketplace. In particular, the Government: (1) improperly relies on a "quick look" standard rather than the governing rule-of-reason standard adopted by the District Court (infra Part I.A); (2) urges this Court to sanction a competitive-effects analysis that fails to account for the commercial realities recognized by even the District Court (infra Part I.B); (3) fails to confront the law precluding a finding that prices are "supracompetitive" without evidence of costs and margins (infra Part I.C); and (4) fails in its efforts to identify any other evidence that would support a finding of anticompetitive effects (infra Part I.D).

### A. The Government Cannot Evade Its Burden To Establish Anticompetitive Effects.

The Government asserts that the "Supreme Court has not tolerated any practice that threatens competitive pricing", citing Broadcast Music Inc. v. CBS Inc., 441 U.S. 1, 23 (1979). Government.Br.49. But, notably, the Government ignores the very next sentence: "Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or

6

even unreasonable restraints." <u>Broadcast Music</u>, 441 U.S. at 23; <u>see also</u> <u>Brantley v.</u> <u>NBC Universal, Inc.</u>, 675 F.3d 1192, 1202 (9th Cir. 2012) ("Even vertical agreements that directly prohibit retail price reductions, eliminating downward competitive pressure on price and thereby resulting in higher consumer prices . . . are not unlawful absent a showing of actual anticompetitive effect.").

As the District Court explained, regardless of the alleged effect of the NDPs on merchant prices, they must be assessed under the full rule of reason, "the most searching form of antitrust analysis".  SPA33-34.  Under that standard, the Government had a threshold burden of proving that, in the absence of the NDPs, prices to the relevant consumers would be lower, output of network services would be greater or quality would be improved.  <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 214 (2d Cir. 2001) (Sotomayor, J.) (requiring "substantial presentation of evidence . . . that salaries would have been higher without the information exchange"); <u>K.M.B.</u> <u>Warehouse Distribs., Inc. v. Walker Mfg. Co.</u>, 61 F.3d 123, 127-28 (2d Cir. 1995) (no adverse effect absent "empirical demonstration concerning the adverse effect of the defendants' arrangement on price or quality" (internal quotation marks and alterations omitted)); <u>see also</u> <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142 F.3d 90, 96 (2d Cir. 1998) (no adverse effect where plaintiff alleged "potentially" higher prices, but did not demonstrate that prices were actually higher across the market or that quality had actually decreased); <u>Capital Imaging Assocs., P.C. v. Mohawk</u>

<u>Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 546 (2d Cir. 1993) (no adverse effect where plaintiff conceded price would not be changed absent restraint and failed to adduce evidence that restraint had reduced quality).

The Government tries to evade its burden by asserting that the "application [of the antitrust laws] does not depend in each particular case upon the ultimate demonstrable consumer effect" because "[a] healthy and unimpaired competitive process is presumed to be in the consumer interest". Government.Br.74-75 (citing <u>Fishman v. Estate of Wirtz</u>, 807 F.2d 520, 536 (7th Cir. 1986)). It likewise argues that when "competition was actually suppressed", there is no need for any evidence of "higher prices or other consumer injury". Government.Br.75 (citing <u>FTC v. Indiana Federation of Dentists</u>, 476 U.S. 447, 455-56, 461-62 (1986) ("<u>IFD</u>")).

However, the cases on which the Government relies for this articulation of its burden are not applying the full rule-of-reason standard. They are cases involving <u>per se</u> liability or the abbreviated "quick look" standard, under which anticompetitive effects are presumed, and the burden immediately shifted, where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets", <u>Cal. Dental Ass'n v. FTC</u>, 526 U.S. 756, 770-71 (1999). <u>See</u> <u>IFD</u>, 476 U.S. at 455-56 (applying quick-look analysis to horizontal restraint); <u>NCAA v. Bd.</u>

8

of Regents of the Univ. of Oklahoma, 468 U.S. 85, 110 (1984) (same)

(Government.Br.48); Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679

(1978) (same) (Government.Br.48, 51, 54, 56); Fishman, 807 F.2d at 539-41

(finding group boycott unlawful per se).  The District Court correctly rejected

application of the "quick look" standard because the competitive effects of the NDPs

are far from "obvious".  SPA33-34 & n.7.

Moreover, contrary to the Government's assertions, the NDPs—which

address merchant conduct at the point of sale, the critical "moment of truth" where

cardholders and merchants interact outside of Amex's presence—were not designed

to "stifle" competition.  They were designed to facilitate Amex's ability to compete

for share of consumer spend against Amex's ubiquitous rivals by offering a

premium, differentiated product to consumers.  Amex.Br.23-25.  And they were

refined in the early 1990s to enable Amex to compete against its dominant rivals in

the face of Visa's efforts to enlist the very merchants Amex depends upon to "attack

[Amex's] real and perceived advantages" to "weaken [its] financial engine" and

"keep Amex as a niche [travel and entertainment] product" through merchant

steering.  Amex.Br.20-23.  Visa's own documents and testimony made it clear that it

expected these steering efforts, labeled "blackmail" by the largest retailer in the

United States, to break Amex's "success cycle", disable it as a competitive force and

preclude it from competing for transaction volume in more than half the market.  Id.

9

The "quick look" approach advocated by the Government would ignore all of these complex competitive dynamics—as the Government does in portraying merchant steering as procompetitive—and require the Government simply to offer the NDPs into evidence to satisfy its burden.  It would also set a precedent that the first step of the rule of reason and the plaintiffs' threshold burden is satisfied whenever any evidence exists that the challenged restraint "affected" price, which is virtually always the case.

The Government's attempt to equate the NDPs with horizontal restraints through its assertion that the NDPs "dictate how all the GPCC networks compete", Government.Br.47 (citing SPA136), also does nothing to change the Government's burden to show actual anticompetitive effects under the rule of reason.  Vertical restraints that "dictate how competitors compete" are routinely deemed reasonable and lawful.  An exclusive dealing agreement "dictates" that the excluded competitor cannot do business with a particular supplier.  See, e.g., CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999).  A "most favored nation" provision "dictates" that no competitor will compete on the basis of a lower price because it will not get any benefit from that lower price.  See, e.g., Ocean State Physicians Health Plan, Inc. v. Blue Cross & Blue Shield of Rhode Island, 883 F.2d 1101, 1110 (1st Cir. 1989).  Such an impact on interbrand competition does not lessen a plaintiff's burden to prove actual anticompetitive effects in the market.  Try

as it might to advocate for a different standard, the Government cannot escape the well-settled principle that the existence of a restraint is the beginning of the antitrust inquiry, not the end.

### B. The District Court Should Have Required the Government To Prove Harm to Overall Competition, Not Just That Merchant Discount Rates Are "High".

There is no dispute that the consumption of network services by merchants and cardholders is "deeply interrelated", "integrated" and "inextricably linked". SPA5, 42, 79. In fact, a GPCC transaction can only occur, and network services can only be consumed, "in fixed proportions" and "simultaneous[ly]" when one cardholder is "matched" to one merchant. Amex.Br.10-13; SPA10-11. Because of this interrelationship, competition among the four networks for transaction volume is expressed across a wide spectrum of conduct aimed at both of the two inseparable sides of every transaction. That includes, for example, competition for cardholders by offering them ever increasing rewards and benefits and competition for merchants by delivering higher-spend cardholders and products and services to help them grow their businesses, such as marketing, financing and fraud protection. SPA14-20.

The District Court dismissed a whole slice of that competition— competition for cardholder spend—as part of a separate issuing market, and the Government defends that legal conclusion on the ground that only competition on

11

the merchant side matters.  But the District Court's own findings show that

competition between the networks does not (and cannot) occur in such a one-sided

manner.  The acquisition of a cardholder or the agreement of a merchant to accept

the card can occur in isolation.  But neither is sufficient for the consumption of

network services—that is, the actual use of a card at the point of sale, which

simultaneously involves the merchant and the cardholder.  SPA11-12.  Since the

"overarching standard is whether defendants' actions diminish overall competition,

and hence consumer welfare", K.M.B., 61 F.3d at 127-28 (internal quotation marks

omitted), the District Court should have required the Government to prove that the

vigorous competition for share of transaction volume—in the ways it is actually

expressed—would be more robust in a world without the NDPs, not just that

merchant discount rates would be lower.  The Government's arguments to the

contrary are unpersuasive.

> First, that merchant prices might be lower absent the NDPs—even

assuming that were true—is not by itself evidence of an anticompetitive effect.  As

noted above, the Supreme Court has recognized that practices that impact price can

be reasonable and lawful.  Broadcast Music, 441 U.S. at 23.  Here, the price

merchants pay is, at best, half the story.  As the Government concedes, "what

merchants pay" is the merchant discount rate, not some hypothetical "network

service fee", and much of "what merchants pay" is passed through (or paid) to

cardholders in the form of cashback and other rewards.  Government.Br.9, 86;

SPA91 n.36; A919.6665:21-6666:3.[1]

Lower merchant discount rates would perhaps (in the short run) be

better for merchants but, standing alone, do not mean that interbrand competition

among the four GPCC networks for transaction volume is enhanced.  A reduction in

the merchant discount rate will reduce the funding for rewards and other benefits

that are critical to that interbrand competition.  As a result, Professor Katz conceded

at trial that a reduction in the prices charged to the merchant "can harm consumers".

A874.4177:8-13.  He also conceded, years ago in U.S. v. Visa, that "focusing solely

on one dimension of multidimensional competitive behavior" would result in "an

incomplete, and thus misleading, picture of economic effects" because "merchant

and consumer welfare has to be measured in terms of the total package of benefits

that they receive, not just the merchant discount rate".  A872-73.4172:16-4173:14.

Interbrand competition—and overall consumer welfare—may well be enhanced if

higher merchant discount rates fuel more vigorous competition for cardholder

spend.

---

[1] The Government erroneously claims that the network "keeps" the rest. Government.Br.9.  That misstates the cited testimony, which accounts only for rewards and not any of the other expenses associated with providing services to merchants and cardholders, let alone the costs of running and maintaining the network.  A846.3853:3-24.  As noted, the District Court acknowledged that it lacked reliable cost and margin evidence.  See infra Part I.C.

It therefore defied economic logic for the District Court to resolve this case solely by looking at merchant discount rates while ignoring the other ways in which the networks compete, including competing to have cardholders actually acquire and use their cards versus those offered by competing networks.  The District Court's approach also violated the relevant legal standard, which requires harm to "overall competition", K.M.B., 61 F.3d at 127-28, in the market "as a whole", Capital Imaging, 996 F.2d 537 at 543.  While the Government argues that the NDPs "sever the essential link" between price and demand, Government.Br.45, that too is premised on ignoring half the competitive picture.  The Government is conflating the merchant discount rate with the price of each unit of network services.  The actual, or "net", price of a single unit of network services—a transaction—is not the merchant discount fee; it is the combination of what is paid by merchants and to cardholders for each transaction.  SPA47-48.

Second, the Government and amici merchants argue that this Court's precedents requiring proof of harm to competition in the market "as a whole" stand only for the proposition that a plaintiff cannot discharge its initial burden by establishing harm to only a single "competitor".   Government.Br.68-77; Home.Depot.Br.10-11 (2d.Cir.Dkt.187); Ahold.Br.13-14 (2d.Cir.Dkt.195).  Even overlooking that merchants are not "competitors" in the relevant market, that reading of this Court's precedents glosses over the legal principle for which they

14

stand:  An antitrust plaintiff must prove harm to competition, not just harm to a

particular market participant.  Given that the object of the antitrust laws is to ensure

overall consumer welfare, K.M.B., 61 F.3d at 128, harm to only one of two joint

consumers—just like harm to only one of many competitors—cannot discharge a

plaintiff's burden under the rule of reason to prove that the "defendants' activities

have had any adverse impact on price, quality, or output of [the relevant] services

offered to consumers in the relevant market", Capital Imaging, 996 F.2d at 547.

Behind this principle is a fundamental recognition that the interests of the various

participants in a competitive market may be in tension with one another and with the

Sherman Act's interest in overall interbrand competition.  This Court's precedents

account for this diversity of interests by requiring a plaintiff to prove an injury to

competition in the relevant market as a whole, not just an injury to a select portion of

the participants in that market.

          Consistent with this principle, both this Court and the District Court

in U.S. v. Visa appropriately analyzed both merchant and cardholder interests, not

just those of merchants alone.  The Government's only response is that the violation

in that case was "predicated on the proof that 'the competitive process itself had

been harmed'".  Government.Br.73 (quoting United States v. Visa U.S.A. Inc.

("Visa I"), 163 F. Supp. 2d 322, 344 (S.D.N.Y. 2001), aff'd, 344 F.3d 229 (2d Cir.

2003) ("Visa II")).  But the cited passage was simply the court's articulation of the

15

basic principle that the antitrust laws are violated only when competition is harmed. In U.S. v. Visa, the courts found that the standard had been met only after focusing on the effect of the challenged restraints on overall competition and the way in which it affected both merchants and cardholders.  Amex.Br.46-48.  That is precisely the analysis—which asks whether interbrand competition, as a whole, has been harmed—that was lacking below.[2]

      Third, the Government argues that requiring it to show an adverse effect on competition in the market as a whole would collapse the three-step burden shifting approach under the rule of reason.  Government.Br.68.  That is not correct. The effect of the challenged restraint on competition for the joint consumers of the product at issue is not a standalone question of procompetitive justification; it is the fundamental threshold question courts must answer in assessing whether there has been an anticompetitive effect in the first place.  See, e.g., Todd, 275 F.3d at

---

[2] The Government again relies on Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953), a case in which the Court never addressed competitive effects since it ruled for defendants on market power.  It asserts that newspapers involve the same simultaneous joint consumption that GPCC network services do. Government.Br.71.  But the District Court found otherwise.  SPA11-12 (distinguishing GPCC services from other two-sided markets based on the inextricable link between merchants and cardholders).  And, as noted, Professor Katz explained that this factual distinction is significant because failure to take into account both sides can lead to a flawed competitive-effects conclusion.

214; Tops Mkts., 142 F.3d at 96; K.M.B., 61 F.3d at 127-28; Capital Imaging, 996 F.2d at 546.

Here, the Government could have carried its burden if it had shown: (a) that the NDPs increased the net price paid by the joint consumers of its services (merchants and cardholders), thereby allowing Amex to earn supracompetitive margins; (b) that the NDPs reduced the output of network services; or (c) that the NDPs reduced the overall quality of network services to the joint consumers of those services. Any of those might have sufficed to shift the burden of proof to Amex, but on each point the Government presented no more than half the story: the alleged effect of the NDPs on the merchant discount rate.

Holding the Government to its burden in this case would not render the second prong of the rule-of-reason inquiry irrelevant. Government.Br.68-69. Had the Government proved that the NDPs harm competition across the market as a whole, the burden would have properly shifted to Amex to meet that showing by proving procompetitive justifications. Those procompetitive justifications could include, for example, preventing free-riding or facilitating entry into a new market with high barriers to entry. Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 890-91 (2007). Holding the Government to its burden in the first step of the rule-of-reason test is perfectly consistent with controlling antitrust doctrine.

17

Fourth, the District Court's failure to hold the Government to its burden is not harmless error.  See, e.g., Government.Br.59, 76, 85.  The District Court's conclusory assertion that any procompetitive justifications failed to outweigh the alleged anticompetitive effects of the NDPs was infected by its improper and premature burden shift.  See Capital Imaging, 996 F.2d at 547 ("Only after a plaintiff has successfully met its initial burden under the rule of reason must an antitrust defendant offer evidence to exonerate its conduct.").  The Government and amici embrace the District Court's finding that there was "no reliable measure of Amex's two-sided price that appropriately accounts for the value or cost of the rewards paid to cardholders" and portray it as a virtue.  Government.Br.76; Home.Depot.Br.7-9; Ahold.Br.11-13.  But without evidence sufficient to establish that the net price for a single unit of network services to consumers and merchants is higher with the NDPs in place than it otherwise would be—evidence it was the Government's burden to proffer—it was impossible for the District Court to determine that the welfare of both sets of consumers has been reduced by the NDPs.  As Professor Katz acknowledged, supra at 13, looking at only one side of a two-sided market shows only half the competitive picture.  That mistake in approach led the District Court to its erroneous conclusion that competition had been harmed.

### C. The Government's Pricing Evidence Was Insufficient To Satisfy Its Burden of Proving Anticompetitive Effects.

As demonstrated above, the Government cannot carry its burden with evidence limited to the effect of the NDPs on merchant discount rates. Amex also demonstrated in its opening brief that it was legal error for the District Court to conclude that Amex's merchant discount rates are "supracompetitive" after it rejected all of the evidence in the record regarding Amex's costs or profit margins as "unreliable". Amex.Br.59-65 (collecting cases).[3] The law in this Circuit demands evidence of a firm's costs because the economic concept of prices "above the competitive level" requires it. See Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 503 (defining "competitive level" as "marginal cost"). In opposition, the Government argues that the District Court "did not need data on Amex's costs or margins" because "it properly found that Amex's Value Recapture initiatives, which increased

---

[3] The Government suggests that the District Court's rejection of evidence relating to Amex's costs was limited to "comparisons across different industry groups at a given time" and "has no bearing on" its conclusions relating to price increases over time during Value Recapture. Government.Br.93. But that contention cannot be squared with the text of the court's decision, which discusses Value Recapture as an anticompetitive effect on the same page that it also finds that "neither party has presented a reliable measure of American Express's two-sided price that appropriately accounts for the value or cost of the rewards paid to cardholders". SPA112. The District Court's recognition that it lacked cost data was a general finding not limited to a single point in time.

19

merchant fees 'already at or above the competitive level,' established supracompetitive pricing". Government.Br.92 (quoting SPA78-84).

As a threshold matter, the Government assumes that the lack of cost data is relevant only to the District Court's findings of market power. Government.Br.90-94. But that is not true; the failure to show supracompetitive merchant prices also undermines the District Court's findings on competitive effects, which similarly rested on pricing evidence. Government.Br.52. Indeed, even if the Government were correct and this case could be resolved by focusing just on merchants and merchant discount rates, the Government's failure to offer data on margins and costs would still require reversal. Without that evidence, there is no basis for a finding that "high prices" are supracompetitive. Each piece of record evidence the Government cites as "amply support[ing]" the District Court's reliance on merchant discount rates only confirms the circularity and lack of rigor of the District Court's reasoning.

First, the Government tries and fails to distinguish Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc., 386 F.3d 485 (2d Cir. 2004) and PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101 (2d Cir. 2002)—both of which hold that allegations of supracompetitive pricing fail where unsupported by evidence of costs and margins. It first attempts to do so formalistically, on the basis that those cases involved Section 2 of the Sherman Act.

20

Government.Br.93-94.  That argument fails on its own terms:  Both cases involved

Section 1 <u>and</u> Section 2 claims, and both cases reject the pricing evidence in

question as to both claims.  <u>Geneva</u>, 386 F.3d at 509 (pricing evidence was

"inconclusive" in establishing actual adverse effect for purposes of Section 1

claim); <u>PepsiCo</u>, 315 F.3d at 101 ("PepsiCo has [not] adequately supported a

Section 1 claim under the rule of reason" in part because "PepsiCo has failed to

demonstrate any significant anticompetitive effect on the price . . . of fountain

syrup").

   The Government's attempt to distinguish <u>Geneva</u> and <u>PepsiCo</u> on their

facts likewise fails.  Government.Br.94.  This case and <u>Geneva</u> are mirror images:

In <u>Geneva</u>, this Court rejected plaintiff's argument that a price decrease that

occurred following the cessation of the defendant's challenged conduct established

monopoly power; here, the Government argues that a price <u>increase</u> that occurred

alongside the defendant's challenged conduct establishes market power.  In both

cases, "absent from plaintiffs' proffer is any analysis of [the defendant's] costs", and

therefore the Court "do[es] not know whether the allegedly elevated prices led to an

abnormally high price-cost margin".  386 F.3d at 500.  And the Government is

simply wrong that "<u>PepsiCo</u> did not involve pricing evidence at all".  <u>See</u> 315 F.3d at

108 (concluding that PepsiCo had failed to "create a triable issue with respect to

whether Coca-Cola charges supracompetitive prices" because "no evidence was proffered" to establish Coca-Cola's costs).

Second, Professor Katz's bald statement at trial that merchant prices were "not below the competitive levels" prior to Value Recapture, Government.Br.90, was unsupported by any evidence. None of the Government's efforts to backfill evidentiary support for that conclusory assertion is persuasive. The fact that the GPCC industry is "concentrated", id., does not establish that the prices charged by GPCC networks are supracompetitive. See, e.g., Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 237 (1993) ("Even in a concentrated market, the occurrence of a price increase does not in itself permit a rational inference of . . . supracompetitive pricing.").

Similarly, the fact that "Visa and MasterCard had been found to have market power and had increased prices", Government.Br.90-91 (internal quotation marks omitted), does not prove that Amex's prices (or anyone else's for that matter) are above the competitive level. In Geneva, this Court refused to infer that a monopolist was charging supracompetitive prices without evidence of margins and costs, even where the monopolist had lowered its prices when new participants entered the market. 386 F.3d at 500; see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp., 971 F.2d 37, 49, 52 (7th Cir. 1992) (rejecting claim that three competitors, which controlled 85 percent of the market and charged the

same prices, had earned supracompetitive profits absent margin and cost data, even after two price reductions in response to regional competitors).

Indeed, as Visa and MasterCard were raising their discount rates, the rewards offered to cardholders on their cards were also increasing significantly. Amex.Br.26-27. Even under the District Court's one-sided view that competition for cardholders through increased rewards is irrelevant to competition because only merchant discount rates matter, those rewards still cost money and those costs must be taken into account in determining whether any network is charging "supracompetitive" prices. The fact that a network (whether it is Amex, Visa, MasterCard or Discover) is charging more today than it did at an earlier point in time could very well be (and, in fact, is) a function of the fact that the overall product has gotten better and the costs of providing it have increased. See Xerox Corp. v. Media Scis., Inc., 660 F. Supp. 2d 535, 549 (S.D.N.Y. 2009) (rejecting plaintiff's claim that defendant's prices were supracompetitive and noting that "a firm's comparatively high price may simply reflect a superior product") (internal quotation marks omitted); see also Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995) (Posner, J.) ("[A] reasonable finder of fact cannot infer

23

monopoly power just from higher prices—the difference may reflect a higher quality more costly to provide. . . .").[4]

   Third, the Government cites the District Court's conclusion that "these Value Recapture initiatives were not paired with offsetting adjustments on the cardholder side of the platform" and "are properly viewed as changes to the net price charged across Amex's integrated platform".  Government.Br.92 (quoting SPA79). But these conclusions are not based on the kind of "hard data" of Amex's costs and margins that this Court has required.  See Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001) (rejecting plaintiff's pricing evidence where the plaintiff failed to provide "hard data" and noting that "expert testimony rooted in hypothetical assumptions cannot substitute for actual market data").  The court expressly found there was no such data in the record, let alone data reconciling Amex's costs and prices for the entire relevant time period, including the decade before Value Recapture when Amex's investments in cardmember benefits rose steeply even while merchant prices remained constant or fell.

---

  [4] The testimony of Discover's CEO that Discover was offering "competitive" rewards in the 1990s while offering low merchant rates, Government.Br.58, also does nothing to prove that current rewards levels could be maintained in the face of reduced discount rates.  Instead, a return to 1990s discount rates would be expected to require a decrease in even Discover's rewards, particularly given Discover's testimony that it is operating efficiently today and could not be expected to reduce significantly other operational expenses.  A712.822:6-9.

24

A705.738:8-739:14; A904.4724:22-4725:5. Rather, the court relied on what it

characterized as "circumstantial evidence and expert testimony": Professor

Katz's ipse dixit discussed above, internal Amex accounting analyses that contain

no reference to the cost of cardholder rewards, and a document the Government

moved into evidence after the conclusion of its case-in-chief, containing a statement

by an Amex executive it never called to testify, that stands for the unremarkable

proposition that American Express earns an accounting profit. SPA112; see also

SPA82-83. That evidence was insufficient as a matter of law to establish

supracompetitive prices. Virgin Atl., 257 F.3d at 264; see also Bailey v. Allgas, Inc.,

284 F.3d 1237, 1252 & n.21 (11th Cir. 2002) (cautioning that accounting data "are

more a reflection of various accounting conventions than true economic profit" and

do not capture proper subjects of antitrust analysis such as spillover and the rate of

return necessary to compensate shareholders for the opportunity cost of their

investment); A868.4103:25-4104:14 (Professor Katz conceding difference between

accounting and economic profits).

       Fourth, the Government invokes Visa II for the proposition that

"market power can be proved without data on costs or margins through 'evidence of

specific conduct undertaken by the defendant that indicates he has the power to

affect price'". Government.Br.93 (quoting Visa II, 344 F.3d at 239). That is

irrelevant because the District Court here grounded its finding of anticompetitive

effects on "high" prices and not other conduct (other than the mere existence of the NDPs). It is also no answer to whether "high" prices equate to "supracompetitive" prices. In any event, the discussion from Visa II that the Government cites is referring to Visa's and MasterCard's market power in connection with those networks' ubiquity—not their supposedly supracompetitive prices to merchants, which were not at issue in that case. Visa II, 344 F.3d at 239-40. As addressed below (see infra Part III), that ubiquity is entirely distinct from the evidence on which the District Court relied in this case. And, even more significantly, in Visa II, the court's findings of market power and competitive harm were premised on other evidence unrelated to pricing—in particular, the "total exclusion" of competitors, which this Court called "[t]he most persuasive evidence of harm to competition". 344 F.3d at 240. Here, the Government's entire case unravels because the pricing evidence is insufficient.

As a matter of law and economics, it is impermissible to conclude that a "high price" is a supracompetitive price absent evidence of a firm's costs. The District Court concluded that Amex's prices were supracompetitive "even without such data". SPA112. That is fatal to the District Court's reliance on pricing evidence with respect to both anticompetitive effects and market power.

26

**D.    The Other Evidence Cited by the Government Fails To Establish Anticompetitive Effects.**

The Government claims that the District Court identified a series of anticompetitive effects unrelated to merchant discount rates that are sufficient to affirm.  That is incorrect.

To begin, the "stunt[] to innovation" from the lack of "low cost" suppliers, Government.Br.32-34, is just another flavor of the claim that the Government could carry its burden simply by showing that merchants would pay less absent the NDPs.[5]  The same is true for the supposed effect of increased retail product prices; if the merchant discount rates are not supracompetitive, then their effect on retail prices cannot be anticompetitive.  (See supra Part I.C.)

In addition, the District Court's focus on retail prices charged to consumers is directly inconsistent with its determination to ignore the full spectrum of competition as it relates to cardholders.  This is particularly true of the Court's reliance on retail price changes to non-cardholders allegedly caused by the NDPs.  SPA99.  If cardholders who actually consume and use network services are outside of the market—and therefore irrelevant to an analysis of anticompetitive effects

---

[5] In fact, there is undisputed evidence that Amex has driven tremendous innovation, just as the Government expressly hoped when it previously brought suit against Visa and MasterCard and extolled the virtues of Amex's differentiated model.  A880.  The District Court's speculation about supposedly lost innovation took no account of these facts.

27

according to the District Court—consumers who do not even use credit cards must also be outside the relevant market. Relying on the effect of the NDPs on some consumers (those without credit cards) to support the Government's case, while ignoring the effects of the NDPs on other consumers (those with credit cards) based on an assertion that taking account of the latter would "frustrate the court's analysis", SPA42, is indefensible.

The same inconsistency arises with the District Court's reliance on supposed retail price increases to cardholders. On the one hand, the Government cites increased retail prices to cardholders as direct evidence of an anticompetitive effect. Government.Br.77; SPA98. On the other hand, it rejects the notion that it is appropriate even to consider the impact of reduced cardholder rewards—which everyone agrees is a price increase to cardholders, Amex.Br.13-14—in analyzing competitive effects. Government.Br.68; SPA99. How can it be that a cardholder price increase is direct evidence of anticompetitive effects when it is effectuated through higher retail prices, but irrelevant when it is effectuated through reduced cardholder rewards?

Finally, the Government also failed to prove a reduction in output. While the Government need not prove an adverse effect on both output and price, Government.Br.65, it does need to prove one. See, e.g., K.M.B., 61 F.3d at 128-29. Here, there is no dispute that output has increased. The Government tellingly resorts

to arguing that Amex has waived any argument based on the explosion of output in the relevant market as the District Court defined it.  But that is not true:  Amex pressed this same argument below.  See A581.  The Government also argues that transaction volume has expanded at roughly the rate of general retail spend.  Government.Br.60.  Even assuming that is true—and that was not a fact the Government sought to establish at trial—that still does not suggest, let alone prove, that the NDPs have any output-reducing effect.

## II.  THE DISTRICT COURT ERRED BY DEFINING THE ONLY RELEVANT MARKET AS "NETWORK SERVICES".

The Government's observation that Amex does not challenge the District Court's factual findings as to market definition misses the point.  Government.Br.77-78.  Amex's appellate point is a legal challenge premised on the facts as found by the District Court.  It is legally impermissible to define a market to exclude half of the relevant consumers, and it makes no sense to do so for the stated reason that a different approach (i.e., including 100 percent of the relevant consumers) would "frustrate" the court's analysis.  SPA40-42.  The Government's arguments to the contrary fail.

First, as explained in Amex's opening brief, the District Court defined a market of "network services" yet based its entire analysis of market power and competitive effects on the merchant discount rate, not the "network services" fee.

Amex.Br.63.  The Government tries to defend this disconnect by arguing that the

merchant discount rate is "what merchants pay".  Government.Br.86.  But this

argument just highlights the artificiality of the Government's market, focusing

(wrongly) on the merchant side of the market alone.  At the very least, the District

Court should have required the Government to prove the merchant price <u>for the</u>

<u>product in the Government's own proposed antitrust market</u>.  As the Government

tacitly concedes, it did not.

   <u>Second</u>, the Government argues that network services to merchants are

not reasonably interchangeable with the issuance of cards to consumers.

Government.Br.78-79, 84-85.  But "network services"—the relevant product in this

market—cannot exist without <u>both</u> a merchant and a cardholder.  SPA11-12.  It

defies basic antitrust economics to split the market for a single product in half such

that the joint consumers required to buy that product exist in different markets.  It

also makes no difference that cardholders consume network services indirectly

through the entity that issues them their cards.  As the graphic on page 4 of the

Government's brief demonstrates, merchants are also indirect purchasers of network

services, which they purchase in the first instance from acquirers, not networks.

When discussing this graphic (his own) at trial, Professor Katz conceded that the end

consumers of network services are merchants on one side of the market and

cardholders on the other side.  A838.3829:4-7.  The District Court erred by cutting

that single, two-sided market in half.

Third, the cases cited by the Government for the proposition that the

relevant market can exclude "multiple sets of non-interchangeable products" are

inapposite.  Government.Br.83-84.  In each case, the products that were defined to

reside in separate markets could be—and often were—purchased separately.  A

consumer can buy men's shoes without simultaneously buying women's

shoes, Brown Shoe Co. v. United States, 370 U.S. 294, 325-26 (1962); a business

can buy copier parts without simultaneously buying service, Eastman Kodak Co. v.

Image Technical Services, 504 U.S. 451, 462 (1992); a consumer can buy film

without simultaneously buying a camera, Berkey Photo, Inc. v. Eastman Kodak Co.,

603 F.2d 263, 269 (1979); and a consumer can buy a newspaper without

simultaneously having an advertiser buy more ad space, Times-Picayune, 345 U.S.

at 610.

By contrast, providing network services to merchants and providing

network services to cardholders together constitute a single, inseparable unit of

output, as found by the District Court.  SPA12.  This finding compels placing them

in the same product market.  United States v. Grinnell Corp., 384 U.S. 563, 572

(1966) ("But there is here a single use, i.e., the protection of property, through a

central station that receives signals. . . . We see no barrier to combining in a single

31

market a number of different products or services where that combination reflects commercial realities.").

Fourth, the Government's argument that Amex "never asked the court to define a card issuance market" also fails. Government.Br.84. Not only is it the plaintiff's obligation (not the defendant's) to establish a relevant market that encompasses the "realities of competition", Balaklaw v. Lovell, 14 F.3d 793, 99 (2d Cir. 1994) (internal quotation marks omitted), but Amex did propose a market for transactions that included both cardholders and merchants. SPA41. Notably, when the Government believed that including cardholders helped its cause in U.S. v. Visa, it alleged a relevant market that included them. The notion that the District Court appropriately excluded consideration of cardholders in this case because the Government made the tactical decision not to ask the District Court to include them is simply wrong. As Amex argued at trial, the undisputed facts and applicable legal standard required the inclusion of cardholders in the relevant two-sided market. SPA39-44.[6]

---

[6] Dr. Frankel—who seeks leave to appear as an amicus curiae—argues that Amex's definition of the term "two-sided" is "imprecise", and that the GPCC industry is only two-sided as a result of "the NDPs themselves". Frankel.Br.7. As an initial matter, Dr. Frankel's argument is properly directed to the District Court's factual findings, not Amex's arguments. Moreover, it fails on its own terms: The discussion on which Dr. Frankel relies makes no mention of any aspect of the NDPs actually at issue in this case. Instead, it discussed only prohibitions on differential surcharging, which the Government expressly declined to challenge in this case.

Fifth, contrary to the Government's assertion, Government.Br.78-79, the District Court's discussion of the SSNIP test or "hypothetical monopolist" is irrelevant to the market-definition issue Amex has appealed. The District Court never discussed the SSNIP test in deciding to exclude cardholders from the relevant market; it did so only in excluding debit from the relevant market. SPA46. The assertion that Amex waived the arguments presented by the economist amici that feedback effects are critical in defining the relevant market, Government.Br.79-80, is also wrong. Amex argued extensively about such feedbacks at trial, and the District Court specifically recognized their existence (but failed adequately to account for them). SPA13 (finding that "a cardholder's experience at one merchant when using a particular network's card . . . affects that cardholder's willingness to use the same card on the next transaction, whether at the same merchant or a different merchant").

## III. THE DISTRICT COURT ERRED IN FINDING MARKET POWER.

As demonstrated above (supra Part I.C), the absence of margin and cost data precludes any reliance on Amex's pricing as evidence of either anticompetitive effects or market power. With respect to market power, that leaves only the

---

SPA26; SPA162; Jean-Charles Rochet & Jean Tirole, Two-Sided Markets:  A Progress Report, 37 Rand J. Econ. 645, 648 (2006) (discussing, among other factors that would render a market two-sided, the "no-surcharge rule").

so-called "insistence" of Amex cardholders, which according to the District Court "amplif[ies]" Amex's otherwise insufficient market share.  SPA71.  Because that conclusion was also error, the District Court's ultimate finding that Amex has antitrust market power cannot stand.[7]

In its opening brief, Amex demonstrated that the District Court erred in finding that Amex has market power by virtue of cardholder insistence.  Amex simply does not own or control its cardholders the way a firm with market power owns or controls key means of production.  Rather, cardholder insistence is a form of brand loyalty that Amex constantly earns by making investments in cardholder rewards and other benefits—investments that can be and are replicated by Amex's GPCC competitors.  Amex.Br.72-79.  As a matter of law, this kind of cardholder loyalty is not sufficiently durable to be a source of market power.  Amex also showed that its cardholder insistence is different from and less durable than the cardholder insistence enjoyed by Visa and MasterCard, which is primarily based on the entrenched ubiquity of Visa and MasterCard both in terms of merchant acceptance and cardholder use.  Amex.Br.78-79.

---

[7] Reversal of the finding of market power alone requires judgment for Amex.  See, e.g., PSKS, Inc. v. Leegin Creative Leather Prods, Inc., 615 F.3d 412, 418 (5th Cir. 2010) (holding, on remand from the Supreme Court, that "even anticompetitive uses of [vertical restraints] do not create concern unless the relevant entity has market power" and thus "[t]o allege a vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power").

The Government responds to Amex's argument with a fatal concession:  Amex's merchant acceptance disadvantage demonstrates that it has no market power over the three million merchant locations where Amex is not accepted.  Government.Br.100.  Market power is "the capacity to inhibit competition <u>market-wide</u>".  <u>K.M.B.</u>, 61 F.3d at 129 (emphasis added).  The millions of locations that choose not to buy Amex's network services are also part of the market that the Government and the District Court defined.  If Amex cannot "force" them "to do something that [they] would not do in a competitive market," <u>Image Tech. Servs.</u>, 504 U.S. at 464 (internal quotation marks omitted), then Amex does not have market power.

The Government and the District Court dismiss these merchants as "probably half the size" of "your local florist," Government.Br.6 (internal quotation marks omitted), preferring to focus on claims that Amex is supposedly squeezing fees out of major corporations like Southwest Airlines and Walgreens.  But the Government did not try to prove, and the District Court did not find, a market limited to GPCC transactions for large merchants.  Indeed, 98 percent of the merchants that <u>do</u> accept Amex, and over whom the Government claims that Amex <u>does</u> have market power, are the same size as the "small merchants" the Government dismisses as irrelevant.  Amex.Br.28.  The Government's attempt to define "your local florist" out of the market throws the Government's theory that the NDPs harmed

competition into stark relief: It is nothing more than the claim that major merchants pay more than they would like for access to the loyal, high-spending cardholders that Amex has competed tirelessly to deliver. That is fatally far afield from the antitrust laws' concern with overall competition.

The Government also pretends that ubiquity is a concept Amex invented for purposes of appeal, noting there is no mention of ubiquity in the decisions in U.S. v. Visa. Government.Br.95. But the District Court here made findings about the ubiquity enjoyed by Visa and MasterCard but not Amex. SPA51, 73 ("American Express may be fairly characterized as a discretionary card for consumers when compared to the ubiquity enjoyed by Visa and MasterCard . . . ."), 129 n.50. The Government also conveniently ignores its own admission in the U.S. v. Visa case that any comparison between Amex's market share and MasterCard's market share is a "red herring" given the structural advantages (including ubiquity) enjoyed by MasterCard. Amex.Br.71-72.

As to whether customer loyalty can be a source of market power, the Government seriously misrepresents the cases on which it relies. The Government claims that this Court in United States v. Eastman Kodak Co., 63 F.3d 95, 106 (2d Cir. 1995), "favorably cite[d] U.S. Anchor as a case where strong brand loyalty created market power". Government.Br.99 (citing U.S. Anchor Mfg., Inc. v. Rule Indus., Inc., 7 F.3d 986, 998 (11th Cir. 1993).) This Court said no such thing because

36

that was not the holding in U.S. Anchor.  The court in U.S. Anchor referred to customer loyalty in the context of defining a market in an attempted monopolization case and then ruled that plaintiff had failed to show that defendant had sufficient power in that market.  7 F.3d at 997-1001.  And this Court's reference to U.S. Anchor in Eastman Kodak was a "see also" cite noting "the unusual circumstance" in U.S. Anchor "of severe price discrimination against a group of distinct customers based solely on brand preference".  63 F.3d at 106.  Here, of course, the District Court rejected the Government's claims of price discrimination.  SPA61-65.[8]

As to whether Amex's cardholder insistence is based on replicable investments, the Government criticizes Amex for focusing on cardholder rewards whereas, according to the Government, insistence is also attributable to Amex's corporate card offerings.  Government.Br.97-98.  But the District Court itself found that cardholder rewards are the "most importan[t]" and "big source" for cardholder insistence.  SPA72 & n.25.  And although the District Court also referred to spending on corporate cards as a secondary source of cardholder insistence, the uncontested record at trial established that Amex and other card issuers compete

---

[8] The other case cited by the Government, L.A. Land Co. v. Brunswick Corp., 6 F.3d 1422, 1428 n.4 (9th Cir. 1993), is equally inapposite.  Indeed, the footnote from L.A. Land cited by the Government simply quotes a treatise for the proposition that "buyer preference for established brands" is one of four possible sources of entry barriers and then goes on to note that the plaintiff in that case "points to no evidence which fits in any of these categories".

fiercely for corporate card business by making the same kinds of replicable investments they make in cardholder rewards.  See A2736-39; A2681-83 (representative corporate card agreements reflecting rebates, bonuses and various other financial incentives provided by Amex in order to obtain corporate card business).

Finally, with respect to whether cardholder insistence is a source of durable market power, the Government tries to assume away the central issue with resort to a frivolous waiver argument.  It is undisputed that the District Court rejected Amex's argument about durability on the basis of its finding that there are high barriers for a new card network to enter the GPCC market.  SPA78.  As Amex demonstrated in its opening brief, that was legal error because it ignores the competition Amex faces from its existing GPCC network rivals—the very companies that can replicate and are replicating the investments Amex has made in order to win cardholder loyalty or insistence.  Amex.Br.77.  The Government responds to this argument by suggesting that the District Court's rejection of Amex's durability argument is a "factual finding" that Amex does not challenge as clearly erroneous.  Government.Br.103.

That assertion is doubly wrong—the District Court's conclusion about durability was not a factual finding and Amex did vigorously challenge it.  To be sure, the District Court made a factual finding that there has not been meaningful

38

entry into the GPCC market for decades while Amex's NDPs were in place, and

Amex does not challenge that finding.  SPA78.  But the District Court erred as a

matter of law in concluding that lack of entry means that Amex's cardholder

insistence is "durable" notwithstanding the law on brand loyalty, and the fact that

Amex must "fiercely compete" with existing rivals "to . . . capture share of wallet by

. . . offering cardholders ever more robust suites of rewards".  SPA134-35.[9]

## IV.  THE DISTRICT COURT'S LIABILITY ANALYSIS AND INJUNCTION ARE INCONSISTENT WITH <u>COLGATE</u>.

In its opening brief, Amex demonstrated that the competitive effects

analysis proffered by the Government and its expert—and accepted by the District

Court—was flawed because it was based on the wrong "but for" world.

Amex.Br.80-82.  The Government and the District Court assumed that, in the "but

for" world absent the NDPs, Amex could not unilaterally terminate merchants that

engage in anti-Amex steering.  As Amex explained, that is simply wrong

---

[9] The Government cites to <u>Eiberger v. Sony Corp. of America</u>, 622 F.2d 1068 (2d Cir. 1980), Government.Br.101, for the proposition that this court has found market power for a firm with a share of only 12 percent.  In that case—unlike here—there were allegations of horizontal collusion that led the District Court to find both an unlawful vertical restraint under the rule of reason and a <u>per se</u> unlawful horizontal agreement to control price.  <u>Eiberger</u>, 622 F.2d at 1070.  The Government's reliance on <u>Toys "R" Us, Inc. v. FTC</u>, 221 F.3d 928 (7th Cir. 2000), Government.Br.101, is similarly unavailing.  Toys "R" Us controlled 40 percent of the relevant market; Amex does not control the portion of the market represented by Visa, MasterCard and Discover transactions, which constitutes three-quarters of the market.  <u>Toys "R" Us</u>, 221 F.3d at 937.

under <u>United States v. Colgate & Co.</u>, 250 U.S. 300 (1919), and <u>Monsanto Co. v. Spray-Rite Serv. Corp.</u>, 465 U.S. 752 (1984), which provide a company like Amex with a broad right unilaterally to refuse to deal with "whomever it likes". <u>Id.</u> at 761.

In its opposition brief, the Government disputes none of this. Government.Br.104-05. Rather, the Government suggests that this error is somehow harmless because (a) even in the correct "but for" world in which Amex retained its <u>Colgate</u> rights, there would have been <u>some</u> steering; and (b) contractual provisions such as the NDPs are more efficient than a unilateral, noncontractual cancellation policy. Those arguments miss the point. The "searching" rule-of-reason analysis used in evaluating a vertical restraint under Section 1 of the Sherman Act, SPA34, requires a weighing of the alleged anticompetitive effects of a restraint against the procompetitive justifications for the restraint. It is obviously impossible to engage in that weighing without properly identifying the magnitude of the alleged anticompetitive effect in the first place. And it is impossible to measure the magnitude correctly if one assumes the wrong "but for" world.

By erroneously comparing the world with NDPs to a "but for" world without NDPs <u>and</u> in which Amex is powerless to curb steering through unilateral termination, the Government and the District Court necessarily overstated the impact of the NDPs in curbing steering. The District Court thus never analyzed

40

what would have happened in a world where Amex had no NDPs but had exercised its <u>Colgate</u> rights.  That is legal error requiring reversal.

In its opening brief, Amex also demonstrated that, in entering an injunction that stripped Amex of its <u>Colgate</u> rights, the District Court fundamentally misread <u>Colgate</u>.  Amex.Br.83.  The District Court said that "<u>Colgate</u> cannot stand for the proposition that a firm's ordinary right to refuse to deal is sacrosanct under circumstances where that firm could use its market power to impose the same harm on competition" through unilateral action, SPA186, when in fact that is exactly what <u>Colgate</u> stands for.  The Government does not dispute that the District Court erred in this regard.  Rather, the Government again suggests that the District Court's error was harmless because the District Court <u>could</u> have correctly construed <u>Colgate</u> and nonetheless entered an injunction stripping Amex of its <u>Colgate</u> rights in an exercise of its discretion.  Government.Br.106-07.

But the Government cannot save the District Court's injunction by speculating about how the District Court <u>might</u> have exercised its discretion if it had read <u>Colgate</u> correctly.  This is particularly true given that, other than its misreading of <u>Colgate</u>, the District Court's primary justification for stripping Amex of its <u>Colgate</u> rights is <u>Toys "R" Us</u>.  As the District Court itself noted, the court in <u>Toys "R" Us</u> enjoined the defendant from unilateral refusals to deal because "[t]hese refusals to deal were the means [Toys "R" Us] used to accomplish the

unlawful result, <u>and as such</u>, they are subject to regulation".  SPA187 (emphasis added) (quoting <u>Toys "R" Us</u>, 221 F.3d at 939, 940).  Here, notwithstanding the Government's misleading suggestion to the contrary, Government.Br.107, the District Court based its liability finding on contractual provisions—the NDPs—not unilateral refusals to deal.  There is no reason to speculate that, absent its misreading of <u>Colgate</u>, the District Court would have chosen to depart from <u>Toys "R" Us</u> and enjoined unilateral conduct that was not the basis for its liability decision.

## CONCLUSION

For the foregoing reasons, and those stated in Amex's opening brief, the judgment of the District Court should be reversed and the Permanent Injunction should be dissolved.

Dated:  October 22, 2015

CRAVATH, SWAINE & MOORE LLP,

by

_____
/s/ Evan R. Chesler

Evan R. Chesler
Peter T. Barbur
Kevin J. Orsini

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

BOIES, SCHILLER & FLEXNER LLP,

by

_____
/s/ Donald L. Flexner

Donald L. Flexner
Philip C. Korologos
Eric J. Brenner

575 Lexington Avenue
Seventh Floor
New York, NY 10022
(212) 446-2300

*Attorneys for Defendants-Appellants American Express Company and American Express Travel Related Services Company, Inc.*

43

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, I certify under penalty of perjury that the foregoing Reply Brief of

Defendants-Appellants American Express Company and American Express Travel

Related Services Company, Inc. (Final Form) is prepared in a proportionally spaced

typeface (14-point Times New Roman) and contains 9,972 words, as calculated by

the Microsoft Word 2007 word processing program and excluding parts of the Brief

exempted by Rule 32(a)(7)(B)(iii).  Accordingly, it complies with Rule 32(a)(5)(A)

and with the Court's Order, dated September 22, 2015, granting

Defendant-Appellants leave to file an oversized reply brief of up to 10,000 words.


October 22, 2015


/s/ Evan R. Chesler
Evan R. Chesler